No. 18,668.

FRANK PIERSON, *Appellant*, v. THE KINGMAN MILLING COMPANY, *Appellee.*

SYLLABUS BY THE COURT.

1. ORAL CONTRACT — *Employment During Life — Statute of Frauds.* An agreement to. provide a person with employment during his life is not required by the statute of frauds to be in writing and signed by the party to be charged, since its performance will not necessarily extend over a year.

2. INJURED EMPLOYEE—*Contract for Settlement Misread—Important Omissions—Employee Not Chargeable with Notice of Omissions.* If an injured employee, who is too weak to read, is induced to sign a contract releasing his employer from liability, by the false representation that it provides for his future employment, the contract being read aloud as though it contained such provision, constructive notice of its real contents is not imparted to him by the fact that his wife, being present as his agent, to aid him in the matter, omitted to read it.

3. SAME—*Receipt—Not Signed by Employer—Contents Misrepresented by Employer—May be Reformed.* A writing acknowledging the receipt of money by an injured employee, and in consideration thereof releasing the employer from liability, although signed only by the employee, is contractual in its nature, and upon sufficient proof may be reformed on his application by inserting a provision for his future employment.

4. CONTRACT—*Employment for Life—Enforceable.* A contract by which an employer agrees to furnish an injured employee

employment for life is not too indefinite for enforcement, although it makes no provision for the kind of work to be done or the amount of compensation.

5. SAME—*Employment During Life—Executed by Secretary— Subsequent Ratification by Corporation.* Evidence to the following effect is sufficient to take to the jury the question whether a corporation was bound by a contract to give life employment to an injured employee: The contract was entered into on behalf of the company by the secretary, who acted as foreman, employing men, making agreements as to their wages, and discharging them. The five directors of the corporation owned all the stock. They were the president (the secretary's father) and his wife, the secretary (who was also treasurer) and his wife, and the vice president. The vice president told the employee before he resumed work that the contract required the company to look after him. When the employee reported after his injury he told the president he was ready to go back to work according to the contract. He was given employment, which continued for four years.

Appeal from Kingman district court; PRESTON B. GILLETT, judge. Opinion filed March 7, 1914. Reversed.

*John H. Connaughton,* and *Charles C. Calkin,* both of Kingman, for the appellant.

*George L. Hay, L. F. Walter,* both of Kingman, and *T. A. Noftzger,* of Wichita, for the appellee.

The opinion of the court was delivered by

MASON, J.: On September 27, 1906, Frank Pierson was injured while in the employ of The Kingman Milling Company, a corporation, his left leg being broken and his right so injured that it was amputated. The next day he signed and delivered to the company a writing reading as follows:

"For a valuable consideration, the same being the payment of money, physicians' charges, medicine bills and other expenses received to my full satisfaction of the Kingman Milling company, I hereby release, acquit and discharge the said company from all claims and demands which I have or may be entitled to have

against it either in my own name or in the name of any one else, and especially from all liability to me from loss or damage which has resulted or may result to me from injuries received and suffered by me by reason of being hurt and injured by the machinery of said company at or in its mill and elevator in the City of Kingman, County of Kingman and State of Kansas, on the 27th day of September, 1906, while in the performance of duty no matter whether said injury was caused by the act, carelessness or negligence of either said company or myself."

In the following May Pierson resumed work for the company, and continued in its employ (possibly with some interruption) until May 27, 1911, when he was discharged. In the meantime his wages, which were originally $1.75 a day, were several times increased, the final amount being $2.50 a day. On June 13, 1911, he brought an action against the company, his petition containing in substance these allegations, among others: The writing referred to was made in pursuance of an agreement between Pierson and the company, which acted through its secretary and treasurer, Jay Holdridge. One of the provisions of the agreement was that the company was to give Pierson continuous employment during his life at labor that would not be injurious to his health or person. Pierson was unable to read the writing because of his weak condition, resulting from his injuries, an operation, and an anæsthetic. Holdridge told him that the provision regarding life employment was included in the writing, and in reliance upon this assurance he signed it. Pierson worked for the company under this understanding of the contract until discharged in May, 1911. The prayer of the petition was that the writing should be reformed by the insertion of the promise of permanent employment, and that the plaintiff should have judgment for damages on account of the company's refusal to perform it. The company, among other defenses, interposed a general denial. Upon trial a demurrer to the plaintiff's evidence was sustained, and he appeals.

The evidence tended in a general way to sustain the allegations of the petition. If the plaintiff failed to make a *prima facie* case it was because of some of the matters hereinafter discussed.

The writing was not signed by the milling company. The statute of frauds does not prevent its enforcement on that account. When it was executed it was possible the contract might be fully performed within a year, since Pierson might have died within that time. (20 Cyc. 202; Note, 35 L. R. A. 514.)

The three-year statute of limitations is invoked on the theory that the action is on an oral agreement. Plaintiff, however, seeks first to reform, and then to enforce, a contract in writing. It is also argued that the action is one for relief on the ground of fraud, the limitation being two years, running from the discovery of the fraud; and that the fraud must be deemed to have been discovered at the time of the signing of the paper, for the reason that the plaintiff's wife, who he testified was acting as his agent, had an opportunity to read the writing and failed to do so. She testified that it was read to her and as read purported to contain the provision relating to permanent employment. There are cases holding that, even between the original parties, one who signs a written contract omits reading it at his peril, if he is able to do so. (Note, 37 L. R. A. 598.) But there are also many decisions to the effect that if one of the parties assumes to read the contract to the other, and purposely misreads it, he can not take advantage of the other's want of care in relying upon his reading of it. (Note, 37 L. R. A. 598.) Whatever may be the general rule on the subject, it can not be said in this case as a matter of law that the wife's opportunity to read the writing imported constructive notice of its contents to her husband.

The defendant maintains that the writing is a receipt, not contractual in its nature, and not open to reformation by the addition of a promise on the part of

the milling company. The instrument, however, is not a mere receipt. It is clearly contractual in virtue of Pierson's agreement to release the company from any claim on his part growing out of his injury. (*Thompson v. Williams,* 30 Kan. 114, 1 Pac. 47; *K. C. & O. Rld. Co. v. Hicks,* 30 Kan. 288, 1 Pac. 396; *Brooks v. Hall,* 36 Kan. 697, 699, 14 Pac. 236.) But it is said that the writing is unilateral in that it contains no agreements on the part of the milling company. Upon the face of the contract it appears that the sole consideration for the release of Pierson's claim was the payment of money already made. The plaintiff seeks to show that in fact the actual consideration included a promise on the part of the milling company, which was to have been included in the writing. Upon proof that fraud was practiced upon him in this regard he was entitled to have the instrument reformed so as to accord with the actual agreement of the parties. The fact that the milling company, which held the instrument, had not signed it, was not material. If it accepted and acted on the writing (and there was evidence to that effect) it was bound by its terms to the same extent as though its signature had been attached. (*Brownson v. Perry,* 71 Kan. 578, 81 Pac. 197; *Hutton v. Stewart,* 90 Kan. 602, 135 Pac. 681.)

The contention is made that even if reformed, in accordance with the plaintiff's request, the contract is unenforceable because of the indefiniteness of its terms, there being no provision as to the kind of work to be done or the compensation to be paid. This view is supported by *L. & N. R. R. Co. v. Cox,* 145 Ky. 667, 141 S. W. 389, where it was said: "If the contract was simply to give Cox steady or permanent employment, and neither the position he was to hold nor the pay he was to receive was stipulated, this contract would be too indefinite for enforcement." (p. 676.) *Bentley v. Smith,* 3 Ga. App. 242, has some tendency to the same effect. *In Texas Cent. R. Co. v. Eldredge,* (Tex. Civ.

App.) 155 S. W. 1010, it was held that such a contract is not unenforceable by reason of the indefiniteness of its terms, where after the agreement was entered into employment was given for several years, without any controversy with respect to work or wages. That situation existed in this case, according to the plaintiff's testimony. This court is of the opinion that the contract relied upon by the plaintiff is not too indefinite to admit of enforcement; that it rests with the employer to select the character of work to be done, so long as it is suitable to the employee's capacity; and that the compensation, unless fixed by agreement, is to be such as is ordinarily paid for similar services. The contract is also objected to on the ground that the duration of the employment is too indefinite. We think this objection unsound, and this view is supported by the authorities (*The Pennsylvania Company v. Dolan*, 6 Ind. App. 109, 32 N. E. 802, 51 Am. St. Rep. 301; *Carnig v. Carr*, 167 Mass. 544, 46 N. E. 117, 35 L. R. A. 513), although there are some cases to the contrary (*Louisville & Nashville Railroad Company v. Offutt*, 99 Ky. 427, 36 S. W. 181; *Speeder Cycle Company v. Teeter*, 18 Ind. App. 474, 48 N. E. 595).

The most difficult question presented is whether there was any evidence of original authority on the part of the secretary and treasurer of the company to make the contract for life employment, or of subsequent ratification of his action. In *Hornick v. U. P. Railroad Co.*, 85 Kan. 568, 118 Pac. 60, it was held that the claim agent of a railroad company has no implied power in that capacity to make such a contract. That case is annotated in 38 L. R. A., n. s., 826. In that note, and others therein referred to, the authorities bearing on the question are collected. In one of the annotated cases it was held that the secretary and treasurer of a corporation has no implied power to make a contract of employment extending beyond his term. (*Laird v. Michi-*

*gan Lubricator Co.*, 153 Mich. 52, 116 N. W. 534, 17 L. R. A., n. s., 177.) In another it was held that the president and actuary of an insurance corporation, having express authority to appoint all persons employed by the company, could not by virtue thereof make a contract engaging a physician as medical officer for life. (*Carney v. N. Y. Life Ins. Co.*, 162 N. Y. 453, 57 N. E. 78, 49 L. R. A. 471.) Here Jay Holdridge testified, in substance, that his duties were such as usually devolved upon a secretary and treasurer; that he employed and discharged men, but only upon authority of his father, who was president and general manager. The plaintiff testified that Jay Holdridge gave him his original employment, that he was the foreman of the company, and was on the ground all the time looking after hiring the men; that he hired and discharged them, agreeing with them as to wages. We shall assume that there was no showing sufficient to support a finding of original authority on the part of Jay Holdridge to bind the company by a contract with the plaintiff to give him employment during his life, but we think there was sufficient evidence of ratification to take that question to the jury. There was evidence that the five directors of the company owned all the stock. Four of them were Jay Holdridge and his wife, and T. J. Holdridge (the president, and father of Jay Holdridge) and his wife. The fifth was a Mr. Corey, the vice president. The plaintiff testified that after he was taken home from the hospital Jay Holdridge and Corey called on him, and they had a conversation in reference to the contract; that Corey gave him to understand that it was in the contract that they were to look after him and they would do it. The witness continued:

"I went to the mill to resume work about the last of April or the first of May the next spring. I saw Mr. Jay Holdridge and his father in the office of the mill. I told them I was ready to go back to work according to the contract. They said, what could I do, and the

old gentleman, Mr. Holdridge, asked me if I could walk without my cane and I walked across the office to show them that I could.  I said it was up to them.  I told them I thought I could go back and take charge of the loading unless there was something better, and they said, 'Alright, I could go back and go to work.' "

Giving the evidence the liberal interpretation to which it is entitled when attacked by demurrer, we think the inference might reasonably be drawn that the plaintiff was given employment in pursuance of the agreement to provide him with permanent work; that both the president and vice president, as well as the secretary and treasurer, knew of his belief that the writing contained a provision on the subject; and that a ratification of the promise thereby resulted.

The judgment is therefore reversed and the cause remanded for a new trial.

BURCH, J. (dissenting):  I dissent from the judgment of reversal for the following reasons:

First, the secretary and treasurer had no authority to bind the corporation by a life-employment contract. Such a contract could be made only by the board of directors or by authority of that body.

Second, there could be no ratification of a life-employment contract except by the board of directors, and by the board on knowledge, not notice or imputed knowledge but full information of all the facts.  (*St. John v. Cornwell*, 52 Kan. 712, 35 Pac. 785.)  The evidence is legally insufficient to establish these essentials of ratification.

Entertaining these views, I do not deem it necessary to express an opinion upon other features of the case.

PORTER, J., and SMITH, J.:  We concur in the foregoing dissent.